UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:12-cr-159-GZS |
| | ) | |
| ABDULLAHI NUR, | ) | |
| | ) | |
| Defendant | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Abdullahi Nur, indicted on two counts of possession with the intent to distribute a mixture or substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1), Indictment (ECF No. 15), moves to suppress statements he made and evidence seized from his person on October 25, 2011, during and after he was arrested by Scarborough, Maine, police officers. Motion to Suppress Evidence ("Motion") (ECF No. 38). An evidentiary hearing was held before me on April 4, 2013, during which the defendant appeared with counsel. The government presented two witnesses and offered three exhibits, all of which were admitted without objection. The defendant called no witnesses and proffered no exhibits. After both sides rested, counsel for each argument orally.[1] I recommend that the following findings of fact be adopted and that the motion be denied.

**I. Proposed Findings of Fact**

Around 2:00 a.m. on October 25, 2011, Officer Brian Nappi and Sergeant Steve Thibodeau of the Scarborough, Maine, Police Department were sitting in their respective

---

[1] During his oral argument, counsel for the defendant stated that the defendant is pressing only his argument that he did not give voluntary consent to be questioned by the police officers. Accordingly, any argument that the evidence seized from his person during a brief search incident to arrest should be suppressed has been waived. I will address only the statements made by the defendant to the police officers.

1

cruisers, parked next to each other just off Payne Road in Scarborough, across from the Extended Stay Hotel, positioned so that the drivers could talk to each other. They both observed a vehicle enter Payne Road from the direction of the hotel without stopping at the intersection.

Both officers followed the vehicle south on Payne Road and observed it cross the center line twice and the white line at the right side of the road once, before Sergeant Thibodeau was able to effect a traffic stop about 200 yards from the intersection. After the car pulled over and stopped, a black male got out of the driver's seat and ran across the road into a gulley and then up to a chain link fence around the property of Pavement Treatments. He ran along the fence until he found a spot where he was able to get through; he then ran around the business's building toward some woods.

Nappi and Thibodeau pursued the driver, repeatedly calling to him to stop and identifying themselves as police. Nappi had drawn his gun as soon as the driver got out of the car; it was dark, and Nappi could not tell whether the driver was armed. He holstered the gun before following the driver through the fence, and after that he and Thibodeau used their flashlights in an attempt to locate the driver. Thibodeau went around the north end of the building, and Nappi went around the south end.

Nappi and Thibodeau heard bushes breaking, and located the driver with their flashlight beams. As they caught up with the driver, he fell to the ground with his hands under his body and said, "You got me." He was reluctant to give the officers his hands so that he could be cuffed, so Nappi delivered some knee strikes to his abdomen until he was able to free the driver's hands and put them in handcuffs. The driver then identified himself as the defendant and apologized to the officers, saying that he ran because he had no driver's license and had been drinking.

2

Nappi and Thibodeau escorted the defendant back through the fence and to the area between the two parked cruisers. The defendant was visibly intoxicated, displayed slurred speech, and had trouble staying on his feet. Two more officers were waiting near the fence. One had run the defendant's name at Thibodeau's request and reported that he had a suspended driver's license and that he was on two sets of bail conditions. Government Exhibit 2 is a written list of one of the sets of bail conditions that were verbally relayed to Nappi and Thibodeau that night.

Nappi and Thibodeau asked Officer Timothy Dalton to conduct a thorough search of the defendant while they searched his car. They found no weapons or contraband in the car, but Dalton found three bags of crack cocaine inside a larger single bag in the left pocket of the defendant's sweatshirt. Dalton asked the defendant if he had any other contraband on his body. The defendant told Dalton to search a particular area of his body, and Dalton refused. Dalton then searched the area of the defendant's waistband at the defendant's suggestion but found nothing.

Dalton then placed the defendant in the back seat of Nappi's cruiser on the passenger side and read him his *Miranda*[2] rights from a card that Dalton always carries, a copy of which is Government Exhibit 1. After Dalton read each sentence from the card, the defendant stated that he understood that sentence. The defendant then stated that he did not want to talk with the officers and wanted a lawyer. Dalton reported this to the other officers. Dalton believed that the defendant was drunk, but also that he was able to make voluntary decisions, as he had when he declined to talk to the officers and invoked his right to counsel.

Shortly thereafter, Dalton and Nappi discovered that the defendant had vomited in the back seat of the cruiser. Nappi asked him if he was all right, and the defendant answered that he

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

was now. As Nappi began to transport the defendant to the Scarborough police station, the defendant began to talk, apologizing again and asking for Nappi's help getting him into the U.S. Army. He offered to give Nappi valuable drug-crime information in return for his help. Nappi, who had not initiated this conversation in any way, told the defendant that he would do his best but that first he would have to read the defendant his rights again at the police station. When the defendant nonetheless began to volunteer information, Nappi told him to stop, and the defendant did.

When they arrived at the police station, the offices got a towel for the defendant, whose clothing was wet, and removed his handcuffs. Nappi read the defendant his rights again, using the same card that Dalton had used, and obtaining verbal confirmation from the defendant after each sentence. The defendant then asked Nappi to search his waistband again; Nappi complied but found nothing.

The defendant waived his rights and agreed to speak with Nappi. He told Nappi that he was from Cambridge, Massachusetts; that he had come to Maine looking for work; and that when he was unable to find work he turned to dealing drugs to make money. The defendant said he had been visiting his girlfriend. When she fell asleep, he took her car keys and her car so that he could sell some crack cocaine that he had concealed in his clothing. He said that he sold about an ounce of crack cocaine a week and was due to pick up more in a day or two from his Boston source, who would come to Maine by bus and sell the cocaine to the defendant before returning to Boston.

The defendant was reluctant to give Nappi the name of his source. He was concerned that, if he was charged with a drug crime, his source would know and would be concerned about dealing with him in the future. He said that he had some money in his girlfriend's room that he

would use for bail, and that he would talk further with Nappi after he was out on bail. After the interview, Nappi asked the defendant to undergo certain sobriety tests, and the defendant did so. Nappi then tested the defendant on a breathalyzer; this test was recorded and a copy of the record is Government Exhibit 3. The video demonstrates that the plaintiff was fully capable of understanding and communicating with Nappi.

The breathalyzer test showed that the defendant had a blood alcohol level of .14%. The limit for driving in Maine is .08%. When asked to rate his degree of intoxication on a scale of 1 to 10, the defendant put himself at level 3.

## II. Discussion

Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments. *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002). In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Connelly,* 479 U.S. at 167. *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged. The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

Counsel for the defendant argued that a blood alcohol level of .14% indicates that the defendant was too intoxicated to make any voluntary statements. He asserted that the Maine Supreme Judicial Court has held that a blood alcohol level of .14% makes it highly unlikely that

the individual could give voluntary consent and argued that this court should accept that standard as well. He cited no authority to support his assertion about Maine law, and none is cited in his motion.

In *State v. Finson*, 447 A.2d 788 (Me. 1982), the Maine Supreme Judicial Court, sitting as the Law Court, held that "[a] person under the influence of alcohol is not necessarily incapable of waiving his constitutional rights or giving a voluntary statement, if despite the degree of intoxication he is aware and capable of comprehending and communicating with coherence and rationality." *Id*. at 792. *See also State v. Barczak*, 562 A.2d 140, 144-45 (Me. 1989); *State v. Clark*, 475 A.2d 418, 420-21 (Me. 1984). In the instant case, Officers Dalton and Nappi offered consistent testimony that demonstrated that the defendant was aware and capable of comprehending and communicating with coherence and rationality, including his ability to invoke his right to counsel after the first *Miranda* warning was given, his attempt to bargain with Nappi in order to obtain assistance in joining the Army, his appropriate responses to each of the officers' questions, his expression of concern about bail, and his demeanor during the breathalyzer test.

My own research has located no reported opinion of Maine's highest court in which any particular blood alcohol level has been held to affect the voluntariness of a statement made to police. It is unlikely that the Law Court has so held, given the widely-available evidence that the effect of specific blood alcohol levels on individuals varies widely due to many other factors. *See, e.g., Sanchez v. Life Ins. Co. of N. Am.*, No. 09-51010, 2010 WL 3447723, at **4 (5th Cir. Sept. 1, 2010); *Loan v. Prudential Ins. Co. of Am.*, 370 Fed.Appx. 592, 2010 WL 960336, at **7 (6th Cir. Mar. 18, 2010) (Guy, J., concurring). In addition, this court has observed that "Maine law reflects that, although blood-alcohol testing is a central component of the state's effort to

6

curb drunk driving, blood-alcohol test results are not dispositive of the impairment question and are not even necessary to a finding of impairment." *Judson v. Mount Desert Police*, Civil No. 06-124-B-W, 2007 WL 2344969, *9 (D. Me. Aug. 10, 2007).

Other federal courts have rejected the argument made here by the defendant in the absence of a defendant's own or an expert witness's testimony to the effect that the defendant's level of intoxication rendered him unable to voluntarily waive his rights, *Johnson v. Rock*, No. 11-cv-05945 (ERK), 2012 WL 3887664, at *2 ( E.D.N.Y. Sept. 7, 2012); where the defendant had a blood alcohol level of .25 percent, *Marcum v. Knight,* 922 F.2d 841 (table), 1991 WL 1106, at *1, *3 (6th Cir. Jan. 8, 1991); and where the defendant's blood alcohol level was .268 percent, *United States v. Muniz*, 1 F.3d 1018, 1021-22 (10th Cir. 1993).

On the evidentiary showing made, the defendant is not entitled to suppression of the statements he made to police officers on October 25, 2011.

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and that the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 25th day of April, 2013.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge